**UNITED STATES of America,**
**Plaintiff,**

v.

**AMC ENTERTAINMENT, INC.,**
**American Multi–Cinema,**
**Inc. Defendants.**

**No. CV 99–01034FMC(SHX).**

United States District Court,
C.D. California.

Jan. 22, 2003.

Leon W. Weidman, Michele C. Marchand, Suzanne L. Bell, AUSA, Office of U.S. Atty., Civ. Div., Los Angeles, CA, Bill Lann Lee, John L. Wodatch, U.S. Dept. of Justice, Civ. Rights Div., Washington, DC, Gretchen Jacobs, U.S. Dept. of Justice, Washington, DC, Dov Lutzker, Joseph C. Russo, Kathleen S. Devine, Phyllis M. Cohen, Devine S. Kathleen, Kristan S. Mayer, U.S. Dept. of Justice, Civ. Rights Div., Washington, DC, for U.S.

David C. Vogel, Robert J. Harrop, Raymond F. Beagle, Jr., Lathrop & Gage, Kansas City, MO, Gregory F. Hurley, Stacey L. Jaramillo, Paul F. Donsbach, Tasia Marie Scolinos, Kutak Rock, Irvine, CA, for AMC Entertainment, Inc., American Multi–Cinema, Inc.

**ORDER GRANTING THE GOVERNMENT'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON NON–LINE–OF–SIGHT ISSUES; ORDER DENYING DEFENDANT'S MOTION FOR INTERLOCUTORY APPEAL.**

COOPER, District Judge.

This matter is before the Court on the Government's Motion for Partial Summary Judgment on the Non–Line–of–Sight Issues (docket # 379), and on Defendant's Motion for Interlocutory Appeal (docket # 409). This matter was heard on January 21, 2003, at which time the parties were in receipt of the Court's tentative Order. For the reasons set forth below, the Court **hereby grants** the Motion for Partial Summary Judgment, and hereby **denies** the Motion for Interlocutory Appeal.

In resolving the Motion for Partial Summary Judgment, the Court examines evidence gathered by the Government's expert, Bill Hecker, in two-to-three-day inspections of twelve of Defendant's Theaters. The Court concludes that the uncontroverted evidence establishes that AMC has engaged in a pattern and practice of violating the ADA.

## I. Factual Background [1]

### A. AMC's Theaters

Defendant AMC Entertainment, Inc., and American Multi–Cinema, Inc., a wholly owned subsidiary of AMC (collectively referred to as "AMC"), are corporations with principal places of business in Kansas City, Missouri. AMC operates movie theaters throughout the United States.

At issue in the current Motion are twelve of AMC's many theater complexes: [2]

1) Barrett Commons, Kennesaw, GA, opened for business on July 2, 1999;

2) Barry Woods Center, Kansas City, MO, opened for business on December 19, 1997;

3) Celebration 2, Celebration, FL, opened for business on December 25, 1996;

4) The Grand, Dallas, TX, opened for business on May 19, 1995;

5) Leawood 20, Town Center Plaza, opened for business in December 19, 1997;

6) Norwalk 20, Norwalk, CA, opened for business on May 10, 1996;

7) Studio 24, Olathe, KS, opened for business on December 19, 1997;

8) Palm Promenade 24, National City, CA, opened for business on September 17, 1999;

9) Pleasure Island at Walt Disney World, Orlando, FL, opened for business on July 4, 1997;

10) Forum 30, Sterling Heights, MI, opened for business on November 19, 1999;

11) Empire 25, Times Square, New York, NY, opened for business July 2, 1999;

12) Promenade 16, Woodland Hills, CA, opened for business on March 28, 1996.

### B. The Government's Expert Report [3]

The Government has filed the declaration and expert report Bill Hecker ("the Hecker Report"). Hecker is an architect

---

1. The facts set forth below are uncontroverted, except as noted.

2. Eleven of the twelve theater complexes at issue were designed and constructed for first occupancy after January 26, 1993; the

twelfth, Pleasure Island at Walt Disney World, was altered after January 26, 1992.

3. AMC's objections to the Hecker Report are overruled.

who is licensed in three states. His curriculum vitae establishes that he has extensive experience in the field of ADA compliance sufficient to qualify him as an expert in this field. (*See* Hecker Report, Appdx. XIII, attached as Exh. I to the Government's Appendix of Declarations and Exhibits). Additionally, Hecker has conducted over five hundred building surveys and has reviewed thousands of pages of architectural plans; these activities involved taking or checking measurements. (Hecker Decl., ¶ 5).

The Hecker Report catalogs well over one thousand accessibility violations at the twelve theater complexes he inspected.[4] For instance, at the Sterling Heights theater complex, Hecker reports the following measurements that are not in compliance with the Americans with Disabilities Act Accessibility Guidelines ("ADAAG"):[5]

**Parking Areas and Exterior Egress Routes:**

There is only one van-accessible parking space out of 22 handicapped spaces and 1274 total spaces. *See* ADAAG 4.1.2(5)(b).

Two of the accessible spaces have no post-mounted sign. *See* ADAAG 4.6.4.

There is an abrupt vertical level change (1/2″) just in front of the curb ramp leading from the central walkway to the entrance. *See* ADAAG 4.5.2.

There are curb ramps with slopes of 25.5% and 22.7%. *See* ADAAG 4.7.2.

At exterior egress routes, there are a number of cross slopes that exceed the maximum 2%. *See* ADAAG 4.3.7.

**Lobby:**

The lowest pay phone is higher than 48″. *See* ADAAG 4.1.3(17)(a).

At auditorium entrance doors off this lobby, there are no raised letter and braille room identification signs mounted 60″ high on the wall to the latch side of the entrance doors. *See* ADAAG 4.1.3(16)(a).

The retractable tape barricades used to cordon off the concession area are higher than 27″ and are not detectable to cane users. *See* ADAAG 4.4.1.

**Circulation Issues:**

A number of objects protrude up to 23″ into the circulation corridors at a height below 80.″ *See* ADAAG 4.4.1

**Auditoriums:**

Wheelchair seating areas are less than 33″ wide in 21 of the 30 auditoriums. *See* ADAAG 4.33.2.

Handrails are too large in diameter. *See* ADAAG 4.8.5.

Ramps have slopes in excess of 8.3% in 26 of the 30 theaters.[6] *See* ADAAG 4.8.2.

The fire alarm pull box cover projects more than 4″ (typically 5½″) into the circulation route. 4.4.1.

---

4. As set forth below, a number of Hecker's measurements are factually disputed by AMC. However, the vast majority of Hecker's measurements are not challenged factually. Although it appears that Pennington (an AMC official who is not an expert in this area) conducted a limited inspection of three of the theater complexes at issue, there is no evidence that AMC has undertaken a review of its theaters similar to that performed by Hecker.

5. These examples are by no means an exhaustive list of the measurements noted by Hecker in his Report. The Hecker Report details these measurements at Appdx. I—XII.

6. Hecker states that he took all slope measurements using a two-foot long digital "Smart Level." (Hecker Decl., ¶ 6). He placed the level at the steepest observed part of the ramps, and measured there. (*Id.*). He checked the calibration of the digital level and recalibrated it as necessary, at the beginning of each day of each theater survey. (*Id.*).

There is no edge protection on the central platform ramps in 18 of the 30 auditoriums. 4.8.7

The companion fixed seats are not provided next to each wheelchair seating area so as to allow "shoulder to shoulder" seating in 26 of the 30 auditoriums. 4.33.3.

**Restrooms:**

A number of handicapped stalls in the men's and women's restrooms had toilets that were not centered properly. 4.17.3.

The men's restrooms had urinals that were placed too high. 4.18.2.

Ambulatory stalls were too wide and toilet seats were too low. 4.22.4.

Stall doors were not self-closing. 4.22.4.

No visible alarm strobes were located in single-user restrooms. 4.1.3(14).

These measurements are representative of those taken at the other eleven theater complexes.

## C. AMC's Expert Report

AMC has offered the opinion of its own expert, Michael P. Gibbens.[7] The Gibbens Report represents a review of the Hecker Report. Gibbens does not give an opinion as to whether the measurements set forth in Hecker's Report are accurate.

Gibbens criticizes the Hecker Report in the following manner:

The Report fails to establish that the twelve theater complexes are subject to the ADA;

the Report does not detail how the improvements were measured or provide information regarding the accuracy of the measurements;

the Report does not indicate if the improvements are accessible to and useable by individuals with disabilities through equivalent facilitation;

the Report does not appear to consider equivalent facilitation or dimensional tolerances in construction;

the Report does not indicate if all the improvements detailed are on required accessible routes or are in fact required to be accessible; and

the Report assumes "shoulder to shoulder" companion seating is required when the ADAAG requires only that one companion seat be placed in each wheelchair seating area.[8]

## D. AMC's Substantive Controverting Evidence [9]

AMC has submitted the declaration of Philip Pennington, AMC's Vice–President of Administration and Special Projects to controvert the evidence set forth in the Hecker Report.

Pennington states that each of the twelve theater complexes were inspected and approved by state building code com-

---

7. This report is signed by Cheryl L. Bevarge for Michael P. Gibbens. The Court is troubled by the fact that Mr. Gibbens did not sign his report in light of the requirement of Fed. R.Civ.P. 26(a)(2)(B) that expert witness reports be signed. *See* Hurley Decl., Exh. O; Fed.R.Civ.P. 26(a)(2)(B).

8. This distinction is related to AMC's argument that it is significant when the ADAAG uses the term "wheelchair space" versus "wheelchair area." This argument is discussed more fully below.

9. The Court has not considered paragraphs 21–24 of the Hurley Declaration. Once again, defense counsel, Gregory F. Hurley, has submitted a declaration in which he purports to controvert certain measurements of the Hecker Report. As clearly explained to defense counsel on a previous occasion, counsel of record is not competent to give evidence on substantive matters at issue in this case. *See United States of America v. AMC Entertainment, Inc.*, 232 F.Supp.2d 1092, 1104–1106 n. 13, 14, 16 (C.D.Cal.2002).

pliance officials at the design stage and during and after construction. (Pennington Decl. at ¶ 4–5).

Pennington also states that, based upon his review of the plans and specifications for the twelve theater complexes, all the ramps in all the auditoriums were designed to have a slope of 1:12 or less.[10]

Pennington performed his own inspection of the slopes of the ramps in three of the twelve theaters inspected: Barry Woods, Olathe, and Leawood. Pennington used a four-foot long smart level, which he calibrated before taking the measurements. Pennington's measurements differed from those set forth in the Hecker Report.[11]

Pennington measured the wheelchair spaces at Barry Woods, and states that all spaces measured 66″ or greater at every point except the very front of the spaces. The space measures 66″ or greater even at the very front if the companion seat armrest is raised.

Pennington states that all auditoriums provide at least one companion seat next to each wheelchair seating area.

Pennington states that AMC does not own the pay phones that the DOJ contends are not in compliance; Pennington also states that he measured the telephones at the Barry Woods Theater, and found them to be in compliance.

Pennington states that AMC does not own any of the parking lots or exterior paths of travel at the following theaters: Barrett Commons, Barry Woods, Celebration, Norwalk, Olathe, Pleasure Island, and Woodland Hills. The Empire 25 in New York has no parking.

Pennington states that all of the "common areas"[12] of the theaters contain alarm systems that comply with the state laws and the ADAAG.

Pennington also states that AMC has a policy of repairing features of its facilities that affect the accessibility of AMC's theaters and that have become out of compliance by wear, use, or other means.

Finally, Pennington states that the DOJ inspection counted only the number of listening devices located at the "guest service counters." Additional devices are available, but are stored in managers' offices or other locations in these theaters.

## II. Summary Judgment Standard

Summary judgment is proper only where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. Rule Civ. Pro. 56(c); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

The moving party bears the initial burden of demonstrating the absence of a

---

**10.** As set forth in the ADAAG, a slope of 1:12 is created when a one-foot vertical rise is accomplished over twelve feet of floor space. This ratio is sometimes expressed as "rise over run." The resulting percent grade created by such a slope is 8.3333...%.

**11.** Unlike Hecker, Pennington did not set forth any measurements for the ramps in the following auditoriums (Hecker's measurements are noted in parentheses): Leawood # 12 (9.3%); Barry Woods # 2 (8.5%), # 12(9.1%), # 15(9.1%), # 17 (8.7%), # 21

(8.5%), # 24 (8.7% and 9.8%). A number of Pennington's own measurements are higher than 8.333...%: Barry Woods: # 3 (8.6%), # 8 (8.6%); Olathe: # 4 (8.4%), # 19 (8.7%), # 29 (8.5% and 8.7%), and # 30 (8.4%); Leawood: # 8 (8.6%).

**12.** Pennington defines "common areas" as lobbies, public restrooms, and auditoriums. Pennington explicitly excludes from this definition those areas that are intended only for use by AMC employees.

genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Whether a fact is material is determined by looking to the governing substantive law; if the fact may affect the outcome, it is material. *Id.* at 248, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202.

If the moving party meets its initial burden, the "adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). Mere disagreement or the bald assertion that a genuine issue of material fact exists does not preclude the use of summary judgment. *Harper v. Wallingford,* 877 F.2d 728 (9th Cir.1989).

The Court construes all evidence and reasonable inferences drawn therefrom in favor of the non-moving party. *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505; *Brookside Assocs. v. Rifkin,* 49 F.3d 490, 492–93 (9th Cir.1995).

### III. The ADA and ADAAG

█ Congress passed the ADA in 1990, based upon factual findings that the disabled suffered from discrimination, isolation, segregation, and lack of physical access to certain facilities. 42 U.S.C. § 12101(a)(1)-(3), (5). Congress found that the disabled were often politically powerless and were left without legal recourse to remedy discrimination against them. 42 U.S.C. § 12101(a)(4), (7). Congress also found that discrimination against the disabled left them severely disadvantaged socially, vocationally, economically, and educationally, and denied them the opportunity to achieve independent living and economic self-sufficiency. 42 U.S.C. § 12101(a)(6), (8), (9).

Congress' stated purpose in enacting the ADA was "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities" and to "to provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1)-(2).

Title III of the ADA prohibits discrimination in public accommodations. 42 U.S.C. § 12181—12189. Specifically, the ADA provides that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a).

Movie theaters are considered "public accommodations" under the ADA. 42 U.S.C. § 12181(7)(C) (defining "public accommodation" as including "motion picture houses"). All twelve theater complexes at issue in this Motion are "motion picture houses" as defined by 42 U.S.C. § 12181(7)(C) and 28 C.F.R. § 36.104. The theater complexes are also "public accommodations" within the meaning of 42 U.S.C. § 12181(7), and "places of public accommodation" within the meaning of 28 C.F.R. § 36104.

The ADA applies to newly constructed public accommodations (those designed or constructed after January 26, 1993) 42 U.S.C. § 12183(a)(1). Eleven of the twelve theater complexes were designed and constructed for first occupancy after January 26, 1993.

The ADA also applies to public accommodations that were altered after January 26, 1992. 42 U.S.C. § 12183(a)(2). The Paradise Island theater complex was altered after January 26, 1992.

The Department of Justice ("DOJ"), through the Attorney General, is charged with enforcing Title III. The DOJ is also responsible for promulgating regulations implementing Title III, issuing technical assistance materials, and filing suit to enforce compliance with the ADA and the implementing regulations. 42 U.S.C. §§ 12186(b), 12188(b), 12206.

In promulgating regulations, the DOJ is required to adopt regulations that meet the minimum guidelines and requirements issued by the Access Board in accordance with 42 U.S.C. § 12204. After a notice-and-comment period, in July 1991, the DOJ promulgated regulations implementing Title III of the ADA. *See generally* 28 C.F.R., Pt. 36; 56 F.R. 35544 (July 26, 1991).

Those regulations include a requirement that individuals with disabilities be afforded goods, services, facilities, privileges, advantages, and accommodations in the most integrated setting appropriate to the needs of the individual. 28 C.F.R. § 36.203(a). As "new constructions", eleven of the twelve theater complexes at issue here are subject to the ADA Accessibility Guidelines, or ADAAG. *See* 28 C.F.R. § 36.406. As a theater altered after January 26, 1992, the altered portions of the Paradise Island theater complex are also subject to the ADAAG. *See* 28 C.F.R. § 36.402(b)(2). The ADAAG can be found at Appendix A to 28 C.F.R., pt. 36.

### IV. Analysis

The Hecker Report establishes hundreds of ADAAG violations at the twelve theater complexes. Pennington's Declaration, at best, creates a triable issue of fact as to only a small subset of these violations. Therefore, the Court has no trouble concluding that, based on the uncontroverted evidence, AMC has violated numer-

ous sections of the ADAAG in each of the twelve theaters surveyed. Moreover, the Court concludes that AMC has engaged in a pattern and practice of discrimination against the disabled in violation of Title III of the ADA. *See International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977) (in Title VII case, noting that a pattern or practice exists "where the denial of rights consists of something more than an isolated, sporadic incident, but is repeated, routine, or of a generalized nature"); *see also* 42 U.S.C. § 12188(b)(1)(B)(i) (authorizing civil action by DOJ to redress pattern and practice violations under Title III of the ADA).

AMC has advanced a number of arguments in its opposition, many of which are worthy of note. AMC argues that the majority of the violations documented by the DOJ deviate from the standards set forth in the ADAAG by small amounts. This "small deviation" argument is related to AMC's position regarding building industry tolerances. *See* ADAAG § 3.2 ("All dimensions are subject to conventional building industry tolerances for field conditions.") However, AMC has provided no evidence regarding any applicable conventional building industry tolerances, which seems to the Court to be a subject for expert testimony. Moreover, many standards set forth in the ADAAG speak in terms of minimums that must be provided. AMC's argument suggests that the Court should shave half an inch or an inch off these articulated minimums. Additionally, the Hecker Report documents a multitude of violations that are not merely half an inch or an inch off. This argument is simply not persuasive. In any event, arguments regarding building industry tolerances are better suited to the remedies phase of this litigation.[13]

---

13. The Court reads the Government's Motion as stopping short of requesting that the Court order a remedy for AMC's documented ADA violations at this time.

AMC criticizes the accuracy of the measurements reported in the Hecker Report and the accuracy of the tools Hecker used. The Court has already noted that Hecker qualifies as an expert on accessible design. Cases such as this require that the Court rely on the opinions of qualified experts.[14] AMC may not sit idly by and merely criticize Hecker without gathering evidence to rebut his conclusions.

Along these same lines, AMC argues that the ramps at issue should have been measured as "rise over run" rather than as a percent grade because the ADAAG standard is expressed as a ratio of 1:12. However, as acknowledged by both parties, a 1:12 ratio results in a percent grade of $8.3333\ldots\%$. Employing relatively simple geometry, the Court concludes that percent grade is probative evidence of whether a given ramp meets the 1:12 standard.[15]

AMC argues that it has provided equivalent facilitation pursuant to ADAAG § 2.2, which states:

> Departures from particular technical and scoping requirements of this guideline by the use of other designs and technologies are permitted where the alternative designs and technologies used will provide substantially equivalent or greater access to and usability of the facility.

There is no evidence that the documented violations were the result of designs and technologies that were implemented in order to provide substantially equivalent or greater access to and usability of the facility. Nor is there evidence that any of the

documented violations have resulted in greater access to the theaters.

AMC argues that there is no requirement in the ADAAG that companion seats sit "shoulder to shoulder" with wheelchair spaces. AMC argues that at least one companion seat is in each wheelchair area (which may contain more than one wheelchair space), and that this is sufficient. The evidence is unclear as to why the companion seats are not "shoulder to shoulder." This issue is better resolved in the remedies phase of the litigation.

Finally, AMC argues that the theaters in Washington, Texas, Maine, and Florida comply with state building codes that are certified by the DOJ as providing protection to the disabled that is equal to or greater than the ADA. This creates a rebuttable presumption of compliance with the ADA. However, the Court concludes that, based on the Hecker Report, the DOJ has sufficiently rebutted this presumption.

Accordingly, the Court **hereby grants** the Government's Motion for Partial Summary Judgment.

### V.  Interlocutory Appeal

■  AMC has requested interlocutory appeal of the Court's November 20, 2002, Order that granted summary judgment in favor of the DOJ on the line-of-sight issue. Interlocutory appeal may be ordered under the following circumstances:

> When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of

---

**14.**  AMC argues that the Hecker Report is inconclusive as to whether the variances reported were the result of routine wear. Again, the Court relies on the opinions of qualified experts to report accurate measurements.

**15.**  Hecker acknowledges that he observed what he believed to be the steepest part of a

given ramp, and measured that portion. Although it is possible, as AMC argues, that a given part of the ramp is slightly more sloped than another portion, this argument is not supported by any evidence that the ramps noted in the Hecker Report have a conforming "rise over run".

the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order. The Court of Appeals which would have jurisdiction of an appeal of such action may thereupon, in its discretion, permit an appeal to be taken from such order, if application is made to it within ten days after the entry of the order . . . .

28 U.S.C. § 1292(b). Although the Court agrees with AMC that the issue is otherwise appropriate for interlocutory appeal, the Court is persuaded by the Government's argument that an immediate appeal will not materially advance the ultimate termination of this litigation. Both parties acknowledge that the Ninth Circuit has currently pending before it a case involving the same issue presented in the Court's November 20, 2002, Order. The case has been fully briefed on appeal, and oral argument was heard in early December 2002. Therefore, the Ninth Circuit is likely to rule on this issue in the coming months. An interlocutory appeal of this Court's order would be unlikely to be resolved for well over a year. Therefore, the Court believes a better course of action would be to await the Ninth Circuit's decision in *Oregon Paralyzed Veterans of America v. Regal Cinemas, Inc.*, No. 01–35554. This matter is set for status conference April 10, 2003, at 3:00 p.m.

Accordingly, the Court **hereby denies** the Motion for Interlocutory Appeal.

## VI. Conclusion

For the reasons set forth above, the Court **hereby grants** the Motion for Partial Summary Judgment (docket # 379), and **hereby denies** the Motion for Interlocutory Appeal (docket # 409).